UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN ALEXANDER,

       Plaintiff,                     Case No. 04-72981

vs.

                                      HONORABLE AVERN COHN
                                      HONORABLE STEVEN D. PEPE

CITY OF DETROIT,

       Defendant.
_____/

REPORT AND RECOMMENDATION FOLLOWING EVIDENTIARY HEARING REGARDING DAMAGES

      August 5, 2004, Plaintiff filed his complaint alleging that on July 8, 2003, he was discharged by the City of Detroit based on race in violation of Title VII of the Civil Rights Act of 1964, as amended, and a second count of intentional infliction of emotional distress under Michigan law. Although the City returned a waiver of service and answered the complaint, it failed to respond to Plaintiff's motion for summary judgment on his Title VII claim seeking $750,000 in damages.[1] On May 24, 2005, Judge Avern Cohn granted Plaintiff summary judgment on liability and referred the issue of damages for report and recommendation. An evidentiary hearing on damages was held on August 24, 2005, and the Defendant was provided an opportunity for supplemental submissions on the availability of reinstatement. None were provided. Plaintiff was provided an opportunity to provide supplemental submissions on the loss

---

[1] The summary judgment motion addresses only the Title VII claim that Plaintiff's July 8, 2003, discharge was because of his race, in part using a City's unanswered requests admission from discovery. (Plaintiff's February 8, 2005, Brief in Support of Plaintiff's Motion for Summary Judgment, at pg. 7.) It also asserts that the unanswered requests for admission establish $450,000 in economic damages, $250,000 for emotional distress as non-economic damages, and interest, costs and attorney fees of $50,000. *Id.* at pg. 16.

from the sale of his home, on the assessment of additional taxes on a lump sum damage award due to increased marginal tax rates as damages, and on the availability of health insurance in his current employment.  For the reasons stated below, IT IS RECOMMENDED that Plaintiff be awarded damages in the amount of $1,101,348.15, including $14,725 in attorney fees and costs..

**I.   ANALYSIS**

**A.   The Hearing**

Plaintiff testified that in his position with the Detroit Housing Commission he served as a project manager and was responsible for overseeing public housing renovation projects.  He worked for the City for almost 13 years and was terminated six weeks after Trent Carroll was hired as his immediate supervisor.  At the time of his termination he was earning $65,100.  Mr. Carroll gave "neglect of duty" as his reason for terminating Plaintiff.  Plaintiff alleges that Mr. Carroll terminated Plaintiff and promoted Preston Smith to the position of project manager based on racial discrimination.  Apparently the Detroit Housing Commission budget only covered one project manager position.  Mr. Carroll and Mr. Smith are African-American and Plaintiff is Caucasian.

Plaintiff offered evidence that he had attempted to secure employment in Michigan after he was terminated, before determining that such was not available and making the decision to move to Georgia.  Plaintiff utilized Internet employment search engines and *Michigan-Works!* to look for comparable employment in Michigan and throughout the country.  Plaintiff estimates that he applied for approximately 60 positions in the Detroit metropolitan area and secured 3 - 4 interviews - none of which resulted in a job placement.  During the interviews that Plaintiff was able to schedule, he was always asked why he was terminated from his employment with the

City and felt that he had to honestly provide the answer he had been given, "neglect of duty." Plaintiff believes this probably prevented him from obtaining those positions.

Plaintiff explained that he eventually sought employment in Georgia because that is where he was getting the most "hits" from his electronically posted resume and because he could find no employment in Michigan. Also relevant to his decision was the fact that his longtime girlfriend was able to apply for a transfer of her employment from Michigan to Georgia. Plaintiff testified regarding his attempts to secure comparable employment in Georgia. In July 2004 Plaintiff spent 3 weeks in Georgia interviewing and looking for work. During this time he interviewed with Halsted Construction, a staffing company, and 3-4 others.[2] Plaintiff was asked why he was terminated from the City at these interviews and, again, provided the answer he had been given. Plaintiff applied to 25-30 businesses in Georgia. Plaintiff accepted a position with Peach State Sign Company in September 2004. The position paid $12.00 per hour and he worked an average of 40 hours per week. He did not consider this comparable work, and continued to look for more comparable employment while he was employed there. He worked for Peach State Sign Company for 2-3 months before leaving to work for PRS Construction as a project manager. This position paid $45,000, but the position only lasted 6 months because the company went into Chapter 11 bankruptcy. Plaintiff then began work for Legacy Construction as a builder, a position in Atlanta Georgia, that he continued to hold at the time of the hearing. This position pays $39,000 annually and did not include fringe benefits initially. Plaintiff was not sure at the time of the hearing whether he was eligible for health insurance benefits at

---

[2] One company, AMCOR, stated that it would be able to give him a job if he moved to Georgia, but he did not follow up with this company when he moved to Georgia because it was located on the opposite side of town from where he actually relocated. Plaintiff stated that he and his girlfriend relocated closer to the location of his girlfriend's place of work.

3

Legacy Construction and admitted that he had not fully explored this option with human resources at Legacy. As noted below, he is eligible for certain benefits.

Plaintiff testified that reinstatement is not an option in this case because his contacts still working at the City inform him that Mr. Carroll is still employed there in the same capacity. Plaintiff argues that he should not be expected to be put in the position of displacing Mr. Smith and working under Mr. Carroll. During the hearing the City's attorney indicated that HUD had taken over the Detroit Housing Commission and it has severed ties with the City since Plaintiff was terminated. The City's counsel intimated that this might mean that there were possible personnel and budget changes which could positively effect Plaintiff's ability to be reinstated with the Detroit Housing Commission. The City's attorney admitted that she could offer no evidence regarding these possible changes in the Detroit Housing Commission or say for certain whether Plaintiff would be required to work under Mr. Carroll if he were reinstated. The City asked to be allowed to submit documentary evidence and/or affidavits to support the fact that the budget and/or staffing changes may allow Plaintiff's reinstatement. The undersigned agreed, allowing two weeks for supplemental submissions. Nothing further was submitted by the City.

Plaintiff testified that he could not afford to keep health insurance after his employment was terminated because the COBRA cost for his and his son's coverage, $600 per month, was too much for him to bear.[3] Therefore, Plaintiff incurred out-of-pocket medical expenses for himself after his termination and also began contributing to the insurance premium payments for his child available through the child's mother. Plaintiff testified that he paid $50/ week for health insurance premiums for himself and his minor child through the City during his

---

[3] He did not inquire what the cost would be to cover just himself and not his son who is eligible for coverage under his mother's health insurance.

4

employment. Plaintiff incurred $99 per month in prescription costs for himself, which would have been subject to a $3 co-pay under the insurance he had with the City.

Plaintiff sold his residence in order to relocate to Georgia. Plaintiff alleged that the time pressured home sale cost him $10,000. Plaintiff agreed to submit the settlement statement for the home.

The parties were also allowed to submit additional case law on the equitable relief sought by Plaintiff and offered a follow up hearing to present additional evidence if needed. No further hearing was requested. Plaintiff has submitted his *Supplemental Brief in Support Of Claim For Damages* and *Second Supplemental Brief In Support Of Claim For Damages*, and the City has not submitted any additional evidence or briefing.

**B.     Calculation of Damages**

The parties agreed to Plaintiff's request for $250,000 award for emotional damages, and both the method of calculation and interest rates Plaintiff used in his Claim For Damages brief. The City challenges (i.) Plaintiff's entitlement to the loss from the sale of his residence, (ii.) health care for himself and his minor child, (iii.) the additional taxes that will be due because of a higher marginal tax rate on a lump sum award, (iv.) any early withdrawal penalty for funds withdrawn from his retirement accounts, and (v.) front pay for future lost wages and benefits.

In its *Response To Plaintiff's Brief In Support Of Claim For Dam ages*, the City challenges Plaintiff's request for front pay on two grounds and proffered that it would present evidence at the evidentiary hearing to show that (a) there was no hostility preventing Plaintiff's reinstatement and (b) Plaintiff failed to mitigate his damages because further administrative remedies were available to him that could have been completed prior to his move to Georgia.

5

The City also purported to have evidence that comparable jobs in Atlanta, Georgia which allegedly "have a mean salary which exceeds what Plaintiff earned" with the City. At the evidentiary hearing, the City did not provide any of this proffered evidence. Instead the City's attorney attempted to call into question the validity and sufficiency of Plaintiff's testimony through cross-examination. This did not provide sufficient argument, evidence or case law to weigh against the arguments, evidence and case law provided by Plaintiff to support the relief requested in his *Claim For Damages*. Therefore, though there may be valid legal or even factual arguments available that would serve to reduce Plaintiff's request for damages, they have not, for the most part, been presented. In the absence of any rebuttal evidence, Plaintiff's evidence, except as otherwise noted below, is found credible and reliable. Accordingly, it is recommended that he be awarded his requested damages as follows:

| Emotional Damages | $250,000 |
| --- | --- |
| Back Pay  2003-2005 | $108,741.53[4] |
| Future Pay 2005-2020 | $402,930.04[5] |

---

[4] Plaintiff's calculations on back pay were figured through July 2005, as presented in the August 24, 2005, hearing brief and his front pay from August 1, 2005, forward through his projected retirement date of 2020. Precise back pay and front pay figures would need to be re-calculated to a point at or nearer to the date of the entry of judgment when Plaintiff's most recent earnings could be determined. Yet, because this report recommends granting both front pay as well as back pay, and further recommends no award of interest on the back pay, the total of the front pay and back pay will be the same using the July 31/August 1 division date on which Plaintiff's calculations are figured instead of another division date between back pay and front pay nearer to the date of final judgment. For this reason, this report will adopt Plaintiff's calculations and the Court need not have them recalculated to a time nearer the date of judgment.

[5] Plaintiff discounted this amount to present value at a rate of 5%, pursuant to M.C.L. 600.6306(2).

| | |
|---|---|
| Lost Pension Benefits | $322,578.15[6] |
| Attorney Fees | $14,725 |
| Early Retirement Withdrawal Penalties | $2,373.43 |
| Detroit Real Estate sale loss | $0[7] |
| Out of Pocket Medical Expenses | $0[8] |
| Minor Child's Insurance Premiums | $0[9] |

---

[6] Plaintiff discounted this amount to present value at a rate of 5%, pursuant to M.C.L. 600.6306(2).

[7] Plaintiff testified that he lost approximately $10,000 on the sale of his residence. At the hearing the undersigned requested a copy of the settlement statement to support this loss and Plaintiff agreed to provide such. An illegible copy of the Settlement Statement was submitted with Plaintiff's *Supplemental Brief In Support of Claim For Damages* and again with Fourth Supplemental Brief filed October 6, 2005. (Dkt. # 21) That brief notes that his closing costs exceeded his closing proceeds by $186.13. But the initial brief and the October 6 brief boh base he $10,000 loss claim on an assertion that his house appraised for $110,000 but only sold for $99.900. There has been no appraisal submitted, nor any testimony or other evidence that the actual sale price was the product of a forced sale and not a fair market value for the house. Houses sell below appraised values at times because the appraisal was inflated in a falling market. There is not sufficient support for this claim of $10,000 damages.

[8] At the hearing Plaintiff explained that the claim for out-of-pocket expenses, $1,700, was for $99 per month prescription costs for himself. At the hearing Plaintiff also explained that he was paying $50 per week in insurance premiums and a $3 co-pay per prescription while employed by the City. His October 5, 2005, Third Supplemental Brief on damages and its supporting affidavit of Plaintiff notes that the payment was $57 per week Thus, his current "out of pocket" medical cost for himself less than what he would have been paying (in premiums + co-pay) had he still been covered by the City's health insurance.

[9] At the hearing and in his Third Supplemental Brief Plaintiff explained that his health insurance premiums had been $57 per week or $239 per month ($57 x 4.2 weeks per month) for himself and his minor child while he was employed by the City. Therefore, Plaintiff cannot be said to be entitled to be reimbursed for the $110 per month he is now paying for the minor child's health insurance premium. Plaintiff is not paying any health insurance premiums currently for himself, and this $110 added to his $99 per month medical expenses noted in the previous footnote are still below the $239 per month he was paying for health insurance at his former job

7

| Pre-judgment Interest | $0 |
|---|---|
| **Total Damages** | **$1,101,348.15** |

Interest

While counsel for the City did not dispute the significant pre-judgment interest calculations which Plaintiff sought, she did challenge the base amount upon which Plaintiff calculated interest. Plaintiff will receive post-judgment interest on his damages pursuant to 28 U.S.C. §1961(a).[10] The issue of pre-judgment interest is less clear cut. Plaintiff's motion for summary judgment was on his federal Title VII claim and not his state claim. Yet, he seeks pre-judgment interest pursuant to Michigan law.[11] Yet, Michigan law does not apply to this Title VII judgment and thus pre-judgment interest cannot be based on state law.

This report does recommend payment as damages of $2,373.43 for early withdrawal tax penalties on his retirement benefits, because these penalties were an unavoidable cost of procuring or being able to use these retirement funds after Plaintiff was wrongfully discharged. But the interest calculations submitted by Plaintiff are not just on the $108,741.53 back pay

---

with the City. In his Third Supplemental Brief Plaintiff notes he will be eligible for health care as of November 1, 2005, at a premium of $150 per week for lesser benefits than available from the Defendant for $57 per week.

[10] Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. 28 U.S.C § 1961(a). Interest is calculated daily to the date of payment. 28 U.S.C. § 1961(b).

[11] In his August 24, hearing brief, at page 10, he seeks $110,275.63 in pre-judgment interest pursuant to M.C.L 600.6013(8).

8

award which measures the money he had to forego having available prior to and during the pendancy of this litigation due to his discharge. Rather the $110,275.63 pre-judgment interest calculations appear to be calculated on a base figure greater than $603,000. This is excessive.

Plaintiff's counsel has cited no case authority for pre-judgment interest on his Title VII damages or even the much smaller $108,741.53 back pay portion of it. There is nothing in the civil rights statute on pre-judgment interest. The Sixth Circuit has upheld prejudgment interest in a sex discrimination case under the remedial provisions of Title VII to restore the aggrieved party to where that individual would have been were it not for the unlawful discrimination. *Equal Employment Opportunity Commission v. Wooster Brush Co. Employees Relief Association,* 727 F.2d 566 579 (6th Cir. 1984), *citing Bricklayers Pension Trust Fund v. Taiariol,* 593 F.2d 783 (7th Cir. 1979). Yet, the Sixth Circuit made no suggestion this was an automatic or commonly accepted practice and it noted that the question of pre-judgment interest was within the discretion of the court to be reviewed by an abuse standard. *Id.*

Plaintiff made no claim for interest in his February 8, 2005, motion for summary judgment, but rather sought total economic damages of $450,000 plus $250,000 in emotional damages and $50,000 in attorney fees. While his current claim for emotional damages remains $250,000, to which the City's attorney has agreed, his economic damage claims have more than doubled between January 2005 and the August 2005 hearing to $942,137.21. Largely because of a nearly non-existent rebuttal case presented by the City's attorney at this hearing and thereafter, this report is recommending full payment of the unchallenged $250,000 in emotional damages and the additional payment of $834,249.72 in economic damages. This total includes a solid and measurable $108,741.53 in lost past salary, and an extremely generous, and far more speculative,

9

front pay award of $402,930.04,[12] plus $322,578.15 in lost future pension benefits.

Plaintiff testified that since his discharge he has had difficulty obtaining comparable employment opportunities to mitigate his damages because of his candor in stating to prospective employers that the reason for his discharge by the City was "neglect of duty." With this Title VII judgment, he can now apply for jobs saying (i.) he was discharged by the City of Detroit because of reverse racial discrimination, (ii.) he has a court judgment to demonstrate that, and (iii.) he was compensated hundreds of thousands of dollars plus his attorney fees for this wrongful discharge. That new and improved script for any job interviews, plus the greatly expanded need for housing construction in the south-central United States after the hurricanes, may well allow Plaintiff to find more remunerative work than his current job, given his great experience and skills, and make some portion of his front pay and fringe benefit award a "dividend" beyond his actual future lost wages and benefits.  While Title VII seeks to make injured plaintiffs whole for their losses, relatively speculatively and generous "front pay" awards and additional prejudgment interest calculated on total damage amount could, at some point, make an individual more than whole for the future, and create a disincentive to make continued efforts to mitigate damages.  For all of these reasons, it is recommended that pre-judgment interest not be awarded

Excess Tax

---

[12] The issue of front pay awarded in current dollar values at the time of judgment is speculative both with regard to the future new job(s) and with regard to the old job.  Unlike the issue of back pay for which the measure of mitigation is in fairly clear historic visibility, this issue of whether a plaintiff could not do better in the future mitigating the economic loss is often very speculative.  Regarding the old job, it is also speculative that the plaintiff would not have lost or left this prior job because of some legitimate future decision of the defendant or because of some personal or health reason.

Plaintiff argues that he is entitled to an additional $162,832.20 in damages to compensate him for the fact that he will be receiving his award of damages in a lump sum payment which will increase his tax liability and reduce his award. This again is a matter for the Court's discretion and again it is recommended that the award not be increased to offset increased tax rate differentials.

Plaintiff can lessen the tax rate penalty by income averaging his tax for the three years preceding the computation year (*See* Tax Reform Act of 1984, Pub.L. No. 98- 369, § 173(a), 98 Stat. 494, 703 (1984)). Also, if this tax issue is significant for Plaintiff, he could ask the Court to enter a judgment requiring structured payments from the City over future years that will defer the income and avoid any negative tax consequences.

Further, the case law cited by Plaintiff which supports the award of a tax component also supports the contention of this report that to award such is a matter of equity and discretion to be used in situations where a claimant's award will be greatly reduced to the point that a claimant is actually in danger of having the benefit of the judgement eliminated. In the present case Plaintiff's award, as described above and without interest, will be $1,101,348.15 without the tax component or $1,264,180.35 if the tax component is ordered. Therefore, this case does not appear to call for such an award.

<u>Health Insurance Cost Differential</u>

Because Plaintiff made a claim for health insurance premiums he pays for his minor child but could not at the time of the evidentiary hearing testify whether his current employer provided health insurance benefits that would cover the child, the undersigned asked that he that provide the information to the court after the hearing. Though this was not an invitation to make an

11

additional claim for damages, Plaintiff provided the information in his Third Supplemental Brief, accompanied by a request for an additional $107,799.09 in health care difference-money damages.  Apparently upon investigation Plaintiff ascertained that he is eligible to receive insurance for himself and his minor child through his employer beginning November 1, 2005.  Yet, the premium and co-pays are significantly higher than the insurance he had through the City.

The City insurance is alleged to have cost Plaintiff $57 per week with a $3 co-pay for prescriptions and no other out-of-pocket expenses, while the insurance through his current employer has a $150 per week premium (for family coverage)[13] and has premiums for office visits ($40), emergency care ($150) and prescriptions ($15-60).  Plaintiff did not provide any plan documents to support these numbers and instead attached his sworn affidavit.  Plaintiff also does not explain why he would elect family coverage when he has already made a claim for damages which includes premiums for his minor son's health care premiums to be paid separately at $110 per month, a significantly lower amount than would be paid if he elected to cover his son through his employer's insurance.  Plaintiff also did not provide the cost of health care coverage for himself alone.

The additional $107,799.09 in damages sought by Plaintiff for the first time in his Third Supplemental Brief is alleged to make up for the difference in premium costs for family coverage between the City's health insurance plan and his new employer's plan for the next fifteen years, with a 9% annual increase in premiums factored into the equation for both plans.

Because Plaintiff failed to request the costs of monthly premiums for his own health

---

[13] It is interesting to note that this is the purported premium cost of the COBRA coverage the City offered to Plaintiff upon his termination, according to Plaintiff's testimony.

insurance as damages in his Motion for Summary Judgment, and again in his original Claim for Damages used at the hearing on this damages issue, he should not be allowed to raise it now. The claims were submitted at the August 24, 2005, hearing with limited supplemental briefing allowed. This was not an open invitation to continue to add items to the damages claim.

Regarding the health insurance claim for his sone that was made in the Claim for Damages and addressed at the August 24, 2005, hearing, as stated above, that is being denied because the current cost to Plaintiff for the minor child's health insurance, $110, has not been shown to be more than Plaintiff was incurring while employed at the City.

**II.     RECOMMENDATION**

Therefore, for the reasons stated above, IT IS RECOMMENDED that Plaintiff be awarded $1,101,348.15, including $14,725 in attorney fees and costs.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: November 10, 2005　　　　　　　　　s/Steven D. Pepe
Ann Arbor, Michigan　　　　　　　　　　　United States Magistrate Judge

Certificate of Service

I hereby certify that copies of the above were served upon the attorneys of record by electronic means or U. S. Mail on November 10, 2005.
　　　　　　　　　　　　　　　　　　　　s/William J. Barkholz
　　　　　　　　　　　　　　　　　　　　Courtroom Deputy Clerk