UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN L. ALEXANDER,

    Plaintiff,

v.                                                                  Case No. 04-72981

CITY OF DETROIT,                                      HONORABLE AVERN COHN

    Defendant.

_____/

**MEMORANDUM AND ORDER**
**REJECTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION,**
**AWARDING DAMAGES TO PLAINTIFF, AND DISMISSING CASE**

## I. Introduction

This is an employment discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Plaintiff Stephen Alexander (Alexander) sued Defendant the City of Detroit (the City) for employment discrimination. The City answered. Alexander moved for summary judgment; the City failed to respond. The Court entered a default judgment on liability in favor of Alexander. After Alexander submitted his damages claim, the Court referred the matter to a magistrate judge for a report and recommendation. After holding an evidentiary hearing and reviewing supplemental papers filed by the parties, the magistrate judge issued a report and recommended that Alexander be awarded damages in the amount of $1,101,348.15, including $14,725.00 in attorney fees.

Before the Court are the City's objections to the report and recommendation. For reasons unrelated to the City's objections, and upon de novo review of the record,[1] the Court shall not follow the report and recommendation as to the recommended amount of damages and instead will award Alexander $750,000.00, the amount he claimed in his motion for summary judgment.[2] The reasons follow.

---

[1] See Fed. R. Civ. P. 72(b) (noting that the Court shall conduct a de novo review of the record after receiving a party's objections to a magistrate judge's report and recommendation on a dispositive matter).

[2] Alexander sought this award of damages in (1) his motion for summary judgment; (2) his brief in support of his motion for summary judgment; (3) an affidavit in which Alexander affirmed that "[t]he appropriate value of [his] economic damages is $450,000" and that his emotional distress "is appropriately valued at $250,000;" (4) a statement of material facts not in dispute; and (5) a proposed order granting his motion for summary judgment in which Alexander proposed that the Court enter judgment in his favor "the sums of $450,000.00 in economic damages, $250,000.00 in non-economic damages, and $50,000.00 for attorneys fees and costs."

## II. Background

### A. Factual Background[3]

The City hired Alexander, a Caucasian male, in September 1990 as a construction inspector with the Detroit Housing Commission (Housing Commission). He was promoted to the position of construction project coordinator in 1999. Alexander's qualifications included five years of service in the British Army, during which he helped constructed airports and bridges; an associate's degree from Macomb Community College in metallurgical science technology; a certificate in nondestructive testing; certificates in concrete and asphalt physical testing; and experience in concrete mix design, asphalt paving, and as an ironworker and a welder.

In 2002, Alexander's manager at the Housing Commission directed him to coordinate a project to use money remaining in an appropriation from the U.S. Department of Housing and Urban Development (HUD) in the installation of a lawn sprinkler system at a Detroit housing project. HUD required its money to be used by a date certain or else the Housing Commission would lose its right to the money. Delays in procuring permits from the City's Department of Building and Safety often required the Housing Commission to perform work before permits were issued. Alexander's manager instructed him to personally supervise the contractor's work on the sprinkler system project to ensure that it was performed properly and to arrange for subsequent inspection by the Department of Building and Safety.

---

[3] The facts relating to Alexander's work and discharge from the City were set forth in his motion for summary judgment, a detailed statement of material facts not in dispute, and an affidavit he filed in support of his summary judgment motion.

Alexander supervised installation of the sprinkler system's backflow preventer, which is a plumbing device that ensures that water introduced into the sprinkler system does not flow back into the fresh water supply from which it came. Alexander stated that the contractor properly installed the backflow preventer and that Alexander completed paperwork that allowed the contractor to be paid for the work performed. Shortly after the Department of Building and Safety inspected the sprinkler system, vandals stripped the sprinkler heads and water lines out of the ground, rendering the system inoperable.

On July 8, 2003, Alexander was suspended for neglect of duty. He was advised that he was being suspended for failing to ensure that the backflow preventer was inspected before the contractor was paid for the job. He was terminated on August 20, 2003 for the same reason. At the time of his termination, Alexander was earning $65,100 annually.

Alexander denied that he neglected his duty; he stated that he complied with his manager's directive and that performing construction work prior to obtaining a permit was a routine occurrence at the City, given the Department of Building and Safety's delay in issuing permits and inspecting and approving work. The other construction project coordinator, Preston Smith (Smith), an African-American male, took the same actions as Alexander on other projects for the Housing Commission but never was charged, disciplined, or terminated.

At the time of Alexander's termination, the Housing Commission was undergoing a restructuring in which one of the construction project coordinator positions was to be eliminated. Alexander was terminated six weeks after Trent Carroll (Carroll), an African-

American male, was hired as Alexander's immediate supervisor. It was Alexander's position that Carroll terminated him and promoted Smith, who had less experience and less seniority than Alexander, to the position of project manager based on reverse racial discrimination.

### B. Procedural Background

Alexander filed his complaint on August 5, 2004. The complaint was in two counts: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; and (2) intentional infliction of emotional distress. The City answered on August 25, 2004. On August 26, 2005, the Court issued a scheduling order stating that discovery was to be completed by January 31, 2005, and motions were to be filed by February 15, 2005.

On September 10, 2004, Alexander's counsel served a first set of interrogatories, document requests, and requests for admission on the City by U.S. Mail. The City did not respond.

On November 5, 2004, Alexander's counsel filed a notice that the City admitted the first set of requests to admit by failing to timely deny them. A copy of the notice was served on counsel for the City by U.S. Mail. The City did not respond.

Also on November 5, 2004, Alexander's counsel faxed counsel for the City a proposed stipulated order compelling discovery and requiring a response to outstanding discovery requests by November 12, 2004. Counsel for the City apparently faxed a signed copy of the order back to Alexander's counsel on November 10, 2004. Alexander's counsel, however, did not present the order to the Court until December 21, 2004, because he believed the City would respond as agreed without necessitating

entry of an order.

On December 21, 2004, the Court entered an order compelling discovery and directing the City to respond to Alexander's first interrogatories by December 31, 2004. The City did not comply.

On January 25, 2005, Alexander's counsel filed a notice that the City admitted the second set of requests to admit by failing to timely deny them. A copy of the notice was served on counsel for the City by U.S. Mail.

On February 8, 2005, Alexander filed a motion for summary judgment together with a certificate of service on counsel for the City.[4] On May 3, 2005, the Court issued a Notice of Hearing directing the City to file a response to the motion by May 11, 2005 and setting a hearing on the motion for May 31, 2005. The City did not respond.

Based on the City's failure to respond to the motion for summary judgment, the Court on May 24, 2005, granted summary judgment in favor of Alexander on liability and set a hearing regarding the determination of damages for June 15, 2005.[5] Alexander and his counsel appeared for the damages hearing on June 15, 2005; the City did not. On June 21, 2005, the Court referred Alexander's claim for damages to a magistrate

---

[4] Alexander's motion for summary judgment addressed only his discrimination claim under Title VII. In support, he relied on the City's unanswered requests for admission, his affidavit, and the pleadings. His motion asserted that the City's unanswered requests for admission establish $450,000 in economic damages, $250,000 for emotional distress as non-economic damages, and interest, costs, and attorney fees of $50,000. See n.2, supra.

[5] See Order Granting Plaintiff's Motion for Summary Judgment and Directing Entry of Default Judgment of Liability Against Defendant and Setting Hearing on the Issue of Damages, filed May 24, 2005.

judge for an evidentiary hearing and a report and recommendation.[6]  The Court attached a detailed discussion of the procedural history of this case as an exhibit to its order of reference.  The City never challenged this procedural history or made any effort to have the Court reconsider the entry of judgment on liability against the City.

### III. Discussion

#### A. Report and Recommendation

The magistrate judge directed the parties to file briefs on the issue of damages.  Both parties complied.  The magistrate judge then held an evidentiary hearing on damages.  Alexander subsequently submitted supplemental briefs on damages; the City did not.  On November 10, 2005, the magistrate judge issued a report and recommendation in which he recommended Alexander be awarded damages as follows:

| Type | Amount |
| --- | --- |
| Emotional Damages | $250,000.00 |
| Back Pay: 2003-2005 | $108,741.53 |
| Front Pay: 2005-2020 | $402,930.04 |
| Lost Pension Benefits | $322,578.15 |
| Attorney Fees | $14,725.00 |
| Early Retirement Withdrawal Penalties | $2,373.43 |
| **Total Damages** | **$1,101,348.15** |

#### B. The City's Objections

---

[6] See Order of Reference to United States Magistrate Judge, filed June 21, 2005. This, in retrospect, was an unnecessary step given the damages Alexander requested when he moved for summary judgment.  See n.2, supra.

The City opposes the report and recommendation. Alexander has responded. The City objects to the magistrate judge's recommendations on two grounds: (1) that Alexander failed to mitigate his damages, thus precluding him from much of the recommended back pay award and all of the front pay award; and (2) the Court should grant the City relief from judgment because the City's numerous failures to respond throughout the history of this case constitutes gross neglect and abandonment.

As stated above, the Court will not follow the magistrate's recommendation as to the amount of damages. Given the inherent uncertainty in an award of front pay, the Court has taken Alexander's representations in his motion for summary judgment at face value.[7] The Court will, in the interests of completeness, address the City's stated objections to an award of damages.

### 1. Failure to Mitigate Damages

#### a. The City's Objections

In support of its assertion that Alexander failed to mitigate his damages, the City says that Alexander's employment was governed by the City's Civil Service Rules. Under these rules, Alexander had the right to challenge his termination by filing a grievance with the City's Civil Service Commission. The City says that, although Alexander started this grievance process after he was terminated, he essentially abandoned the process and thus failed to mitigate his damages.

Alexander filed a grievance after he was terminated in 2003. The City denied the grievance. Alexander appealed, and a hearing before a hearing officer was scheduled

---

[7] See n.2, supra.

for February 27, 2004. Alexander, however, cancelled the hearing. He said at the evidentiary hearing that

> [u]pon finding that the person that was assigned to my case was an attorney with the [C]ity of Detroit [L]aw [D]epartment, I believed it would not be in my interests, and I believed that the lawyer would be biased toward the [C]ity of Detroit, especially in my case.

Evid. Hrg. Tr. at 61:20-25. The City says that, under its grievance procedures, an administrative hearing can proceed in one of two ways: (1) a City of Detroit Law Department attorney may be selected to preside over a grievance hearing,[8] or (2) the grievant may pay $300 to elect an arbitrator from the American Arbitration Association to preside over the grievance hearing. Alexander testified that, while he was aware of the latter option (i.e., paying for an arbitrator to preside over the hearing), he could not afford to elect that option. See id. at 62:7-13. The City says that, had Alexander not cancelled the grievance hearing scheduled for February 27, 2004, and had the hearing officer found that just cause did not exist for the City to terminate Alexander, he would have received a "make whole remedy, including back pay and reinstatement." Def. Opp. Br. at 5.

The City says that Alexander "failed to mitigate by refusing to follow through on his civil service hearing and therefore, [Alexander] should be precluded from claiming damages after the time of his civil service withdrawal." Id. at 6. Additionally, the City argues that reinstatement is the preferred remedy in a case like this. It says that there

---

[8] The City did not explain who that attorney would be or how the attorney would be independent. Under the City's grievance structure, the City attorney presiding over the grievance hearing presumably is the functional equivalent of an administrative law judge. There is not, however, any evidence in the record to establish any independence of the attorney.

9

is no evidence in the record that reinstating Alexander to his position with the Housing Commission cannot or could not be ordered. Finally, the City says that private-industry construction management jobs in Atlanta, Georgia (where Alexander relocated) have a mean annual salary that exceeds what Alexander earned while employed by the City.[9]

### b. Analysis

The goal of Title VII is to "make persons whole for injuries suffered on account of unlawful employment discrimination." Ablemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975). A plaintiff in a Title VII action has a duty to mitigate damages; he may not remain unemployed and collect a windfall. Ford v. Nicks, 866 F.2d 865, 873 (6th Cir. 1989). This mitigation requirement contains a general element of reasonableness, i.e., "[a]n employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so." Id. The plaintiff's diligence must be examined in light of the "individual characteristics of the claimant and the job market." Id. (citing Rasimas v. Mich. Dep't of Mental Health, 714 F.2d 614, 624 (6th Cir. 1983)). When evaluating whether a plaintiff has satisfied the duty to mitigate damages, the Court must be mindful of the fact that a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982). The defendant has the burden of demonstrating that the plaintiff's conduct was so unreasonable as to constitute a failure to mitigate damages. Rasimas, 714 F.2d at 625.

---

[9] The Court will not address this objection, because the City cited no authority and presented no evidence in support of its assertion that construction management jobs in Atlanta have a higher mean annual salary than those in Detroit.

First, with respect to the City's position that Alexander should have been required to appear before a member of the City's law department presiding over the grievance hearing, it is disingenuous for the City to suggest that a member of its law department – the very department representing the City in this case and that would have represented the Housing Commission in Alexander's grievance – would not have, at a minimum, appeared to be biased against Alexander.[10]  It likewise is disrespectful for the City to suggest that Alexander's second option – to pay three hundred dollars for a neutral arbitrator to preside over the hearing – was a viable option.  Alexander was discharged and had no income.  He testified that he could not afford to pay three hundred dollars to obtain an arbitrator from the American Arbitration Association.[11]  Indeed, his failure to do so does not rise to the level of failing to mitigate damages.  See Nicks, 866 F.2d at 873 ("[a]n employee is not required to go to heroic lengths in attempting to mitigate his damages. . . .").

Second, the record is replete with evidence that, notwithstanding Alexander's decision to cancel the grievance hearing, Alexander took the necessary reasonable steps to mitigate his damages following his termination.  Alexander explained at length his efforts to secure employment comparable to that he held at the City:

- ■ The same day he was suspended from the Housing Commission (July 8, 2003), Alexander started searching for other jobs in

---

[10] Indeed, the Court is constrained to observe that there is something inherently wrong with a grievance system in which the arbiter of a grievance hearing is in the employ of the complainant's employer.

[11] The Court sees no reason why the City could not have paid the three hundred dollars necessary to obtain an arbitrator if Alexander objected to the hearing officer being a member of the City's Law Department.

southeast Michigan.  Evid. Hrg. Tr. at 37:12-21.

- He used Internet job search engines to research jobs available in the Detroit metropolitan area.  Id. at 14:12-18.

- He combed the classified advertisements in the Detroit News and the Macomb Daily newspapers.  Id. at 14:21-25.

- He enrolled in a work class with "Michigan Works!"  Id. at 14:25-15:1.

- He applied for approximately sixty positions and received three to four interviews.  Id. at 14:18-20; 17:1-2.

- Because he was unable to find employment in the Detroit area, Alexander broadened his search and began to apply for other positions across the country.  Id. at 19:6-8.

- He began to focus specifically on Georgia because he was receiving the most "hits" from there as a result of his resume posted online.  Id. at 19:18-25.

- He moved to Georgia in September 2004 and obtained a job with Peach State Sign Company maintaining billboards.  Id. at 20:21-21:13.  Although this position was not comparable to his job with the Housing Commission, Alexander was in economic distress and felt that he needed to accept employment, even if it paid $12 per hour.  Id. at 21:18-22:9.

- After working at Peach State Sign Company for approximately two months, Alexander accepted a position as project manager with PRS Construction.  Id. at 26:11-25.  This position was comparable to Alexander's job with the Housing Commission in terms of the skills he used, but his $45,000 annual salary was not comparable to what he received with the City.  Id. at 27:12-20.

- When PRS Construction went bankrupt, Alexander secured a job with Legacy Construction in June 2005.  Id. at 28:2-25; 33:2.  Although his duties and expectations at Legacy Construction are the same as those he had with the Housing Commission, Alexander's $39,000 annual salary is not comparable to the $65,100 the City paid him before terminating him.  Id. at 30:16-31:4.

Alexander acted reasonably after the City terminated him; he did not fail to mitigate his

12

damages.

The City also says that Alexander is not entitled to a front pay award because "[t]here is absolutely no evidence that would support a finding that the preferable remedy, reinstatement, cannot or could not be ordered because [Alexander] had an opportunity for reinstatement prior to his move." Def. Opp. Br. at 6. The City also says that Alexander "cannot argue that the facts surrounding his discharge prevent reinstatement." Id. at 7. Both positions are belied by the record.

Reinstatement is the presumptively favored equitable remedy in a Title VII case. Roush v. KFC Nat'l Mgmt. Co., 10 F.3d 392, 398 (6th Cir. 1993). It is well established, however, that reinstatement may not be appropriate in every Title VII case. Id. Cases in which reinstatement may not be appropriate include those in which the plaintiff has found other work, where reinstatement would require displacement of a non-culpable employee, or where hostility would result. Id.

The City presented no evidence that Alexander had an opportunity for reinstatement prior to his move. What is more troubling, however, is the City's argument that the facts surrounding Alexander's discharge do not prevent reinstatement. Alexander testified at the evidentiary hearing that his former immediate supervisor at the Housing Commission, Trent Carroll, who also terminated him, is still employed at the Housing Commission. Evid. Hrg. Tr. at 81:1-12. Alexander also said that if he were to be reinstated, he would be directly subordinate to Carroll. Id. at 81:13-16. Additionally, Alexander said that he believes there would be a lot of animosity toward him from Carroll and Preston Smith, the other construction project coordinator, if he were reinstated. Id. at 88:10-14. Reinstating Alexander to his former position at the

13

Housing Commission also would require him to quit his current job in Georgia and relocate to Detroit.  Id. at 88:21-89:6.  What is perhaps an even stronger argument against the viability of reinstatement, however, is the apparent reality that the City no longer has control over the Housing Commission.  Counsel for the City asked Alexander at the evidentiary hearing whether he was aware that HUD has taken over the Housing Commission and that the Housing Commission recently severed its ties with the City.  See id. at 99:9-17.  Alexander said that he was not aware of these developments.  Id. at 99:21.  Additionally, Alexander attached as Exhibit 2 to his response brief a document purporting to indicate that, effective July 7, 2005, the City ceded all managerial authority of the Housing Commission to HUD.  See Pl. Resp. Br. Ex. 2.  The City has not challenged this, leaving the Court to conclude that the City no longer has the authority to reinstate Alexander to his former position even if reinstatement were a viable remedy.  Given these circumstances, an award of front pay is permissible.  See Schwartz v. Gregori, 45 F.3d 1017, 1022 (6th Cir. 1995) (holding that when reinstatement is not appropriate or feasible, a court generally awards front pay).

## 2. Relief from Judgment

After repeated failures to respond to Alexander's filings and orders the Court entered, the City now makes a last-minute appeal to save itself from the consequences of its neglect. The City says that the Court should provide it with relief from judgment in this case under Fed. R. Civ. P. 60(b)(6) because its repeated failures to respond constitute "gross neglect and abandonment from which relief from the Magistrate's report and recommendation is warranted." Def. Opp. Br. at 8. This argument is akin to trying to put Humpty Dumpty back together again. It simply comes too late.

### a. Background

The procedural history of this case is replete with examples of the City's failure to defend and disregard of court orders. Throughout the course of this case, the City has filed just three papers:

- ■ The answer, which denied Alexander's claims of race discrimination and intentional infliction of emotional dismiss;

- ■ An extremely sparse three-page brief in response to Alexander's claim for damages, which stated conclusions that (1) had Alexander prevailed at the grievance hearing, he would have received a "make whole remedy;" (2) there is no evidence that reinstatement cannot be ordered; and (3) construction management jobs in Atlanta, Georgia, have a mean annual salary that exceeds that Alexander earned at the City; and

- ■ A brief objecting to the magistrate judge's report and recommendation.

The City failed to respond to Alexander's discovery requests, an order compelling discovery, the motion for summary judgment, and a notice directing the City to respond to the motion for summary judgment. Likewise, the City failed to appear at the court-ordered June 15, 2005 hearing on the determination of damages. The City did,

however, appear before the magistrate judge for the August 24, 2005, evidentiary hearing on the issue of damages.  At no point during the history of this case did the City contact the Court or otherwise offer an explanation for its failures to respond and to appear.  Even when the City appeared at the evidentiary hearing on damages, it did not even attempt to offer an explanation, voice a challenge to the entry of the default judgment, or ask for relief from the judgment.  Rather, the City stipulated to Alexander's emotional distress damages and made weak arguments in opposition to his other claims for damages.  Not until after the magistrate judge issued his report and recommendation did the City attempt to explain its failures to defend.[12]

   The City says that its lawyer assigned to the case started working for its Law Department in the Labor and Employment Division in November 2003 and successfully completed a six-month probationary period in May 2004.  She practiced law for eighteen years prior to her employment with the City, including serving as general counsel to various companies and as a senior associate with a Lansing, Michigan-based law firm.  According to the City, her son was ill and required hospital stays in February 2005.  She apparently failed to report to work or call in for an unknown period that month.  She again failed to report to work or call in on July 18, 19, and 20, 2005.  She did not respond to phone calls made or emails sent to her home.  She reported to work on July 21, 2005, at which time she met with her supervisor and the chief of the City's Law Department to discuss her absence from the office and the status of her cases.  During

---

[12] The City sets forth its explanation in its brief opposing the report and recommendation.  The explanation consists of a series of statements that are unaccompanied by affidavits or offers of evidentiary support.

this meeting, she announced that she was resigning her position with the City because she apparently had been offered a job as the human resources director for a Michigan city. She gave her supervisor and the chief of the City's Law Department a two-week notice and stated that her last day working for the City would be August 9, 2005. The following week, she met with her supervisor and decided to rescind her resignation.

The lawyer and her supervisor appeared at the evidentiary hearing in this case on August 24, 2005. The lawyer conducted the examination of Alexander. She asked the magistrate judge to be able to file supplemental materials with respect to the issue of damages. The magistrate judge granted an additional two weeks for the submission of additional evidence. The City says that the lawyer's supervisor advised the lawyer that she needed to provide supplemental information to the magistrate judge. The City, however, made no further filings, while Alexander filed four supplemental briefs on various issues. After calling in sick to work on September 13, 2005, the lawyer again decided to resign from her position with the City. On September 20, 2005, she emailed her resignation letter with an effective date of September 30, 2005.[13]

---

[13] The City says that the lawyer left much unfinished business on other cases upon her resignation from the City. This failure is really of no moment; the Court is concerned with the conduct at issue in this case.

17

### b. Analysis

Under the Federal Rules of Civil Procedure, a trial court can relieve a party from a final judgment for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

FED. R. CIV. P. 60(b). The City seeks relief under Rule 60(b)(6). Once a motion is properly made under Rule 60(b)(6), it is addressed to the Court's discretion, "which is 'especially broad' given the underlying equitable principles involved." Hopper v. Euclid Manor Nursing Home, Inc., 867 F.2d 291, 294 (6th Cir. 1989). The Court of Appeals for the Sixth Circuit adheres to the view that a district court should apply Rule 60(b)(6) "only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule." Id. The Sixth Circuit has recognized that there is a paucity of case law on this provision of Rule 60, primarily because "almost every conceivable ground for relief is covered under the first three subsections of Rule 60(b)." Olle v. Henry & Wright Corp., 910 F.2d 357, 365 (6th Cir. 1990). Accordingly, the party seeking relief must provide "something more" than one of the grounds contained in Rule 60(b)'s first five clauses. Id. The "'something more' . . . must include unusual and extreme situations where principles of equity *mandate* relief." Id. (emphasis in original).

The City cites Reno v. Int'l Harvester Co., 115 F.R.D. 6 (S.D. Ohio 1986), in support of its requested relief under Rule 60(b)(6). Reno, however, is not analogous to

the circumstances presented in this case, nor does it support awarding the City relief. In Reno, a pro se plaintiff filed a motion requesting that the district court vacate its grant of summary judgment in favor of defendant. Id. at 7. The district court construed the motion as one under Rule 60(b)(6). Id. at 8. The plaintiff in Reno had counsel when her complaint was filed, but her counsel abandoned her after a preliminary pretrial conference. Id. at 7. Plaintiff's counsel did not respond to defendant's motion for summary judgment, causing the district court to enter judgment in favor of defendant. Id. The district court vacated the judgment as a result of plaintiff's counsel's "gross neglect and abandonment." Id. at 8.

Based on the record here, there are not "exceptional or extraordinary circumstances" or "unusual or extreme situations" present that would mandate relief in favor of the City. The City's lawyer displayed a consistent pattern of dereliction of duty by repeatedly failing to respond to materials Alexander filed and failing to appear when the Court ordered the City to do so. Even at the evidentiary hearing when the lawyer for the City and her supervisor appeared, neither of them raised any objection to the judgment against the City on liability or made arguments in favor of relief from that judgment. In Reno, the plaintiff filed her motion seeking to vacate the judgment against her one month after entry of the judgment. Id. at 7. Here, the Court entered judgment in favor of Alexander on May 24, 2005. The City never raised any objection to entry of this judgment until it filed its objections to the magistrate judge's report and recommendation six months later – in November 2005. Additionally, unlike in Reno, there is evidence here that the supervisor of the City's lawyer and the chief of the City's Law Department had knowledge of the neglect on the part of City's lawyer in this case.

The lawyer's repeated absences from work, coupled with her superiors' failure to intervene in this case or otherwise rectify any neglect by the lawyer, cannot be excused.

## IV. Conclusion

The City's objections to the report and recommendation are not well taken.

The Court, notwithstanding the report and recommendation, has an affirmative obligation to ensure that the damages the magistrate judge recommends are reasonable. As stated above, the Court finds that, notwithstanding the City's bare-bones attack on the report and recommendation as to the amount of damages, the proper award of damages to Alexander is $750,000.00 as follows:

| | |
|---|---|
| Economic Damages | $450,000.00 |
| Non-Economic Damages | $250,000.00 |
| Attorney Fees and Costs | $50,000.00 |

The Clerk will enter an appropriate judgment.

SO ORDERED.

      s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: February 9, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 9, 2006, by electronic and/or ordinary mail.

      s/Julie Owens
Case Manager
(313) 234-5160